COURT OF APPEALS OF VIRGINIA

Present: Judges Friedman, Callins and White
Argued by videoconference

JASON DARRELL WILLIAMSON

v.      Record No. 0805-22-3

KRISTI LYNN (BARTLEY) WILLIAMSON

MEMORANDUM OPINION[*] BY
JUDGE KIMBERLEY SLAYTON WHITE
JULY 18, 2023

FROM THE CIRCUIT COURT OF RUSSELL COUNTY
Michael L. Moore, Judge

Robert M. Galumbeck (Galumbeck Stiltner & Gillespie, on brief),
for appellant.

Nicholas B. Compton (Campbell Chafin, P.C., on brief), for
appellee.

Appellant Jason Darrell Williamson challenges the validity of a property settlement

agreement between him and his ex-wife, Kristi Lynn (Bartley) Williamson. Mr. Williamson

argues that the agreement is unconscionable and that the trial court erred in incorporating the

agreement into the divorce decree. Finding that Mr. Williamson failed to prove

unconscionability by clear and convincing evidence, we affirm.

BACKGROUND[1]

"When reviewing a trial court's decision on appeal, we view the evidence in the light

most favorable to the prevailing party, granting it the benefit of any reasonable inferences."

---

[*] This opinion is not designated for publication. *See* Code § 17.1-413(A).

[1] Pursuant to Rule 5A:8(c), "[a] written statement of facts, testimony, and other incidents"
was filed and signed by Judge Moore in lieu of a transcript.

*Galloway v. Galloway*, 47 Va. App. 83, 86 (2005) (quoting *Congdon v. Congdon*, 40 Va. App. 255, 258 (2003)).

Jason Darrell Williamson ("husband") and Kristi Lynn (Bartley) Williamson ("wife") married on August 5, 2000, in Russell County, Virginia. They had one child born of this marriage: Elijah David Williamson, born on December 27, 2003. On October 25, 2020, husband, without notifying anyone[2] of his true intentions, went to South Carolina to live with a friend who would help him obtain employment. Husband had been terminated from his previous employment because he stopped showing up for work. In addition to employment opportunities, husband also testified that he needed some time to evaluate their marriage. Although husband testified that he had asked wife to move with him to South Carolina and sell the home, text messages between them indicate that, in response to wife's overture for reconciliation,[3] husband responded "[if you] want me to be happy you will let me go and stop pilling [sic] all the debt you can in my lap."

Between October 25, 2020, and November 22, 2020, husband and wife conducted negotiations regarding the division of their property via text messages and emails. In the text messages, they discussed the division of personal property, liquidation of retirement and other accounts, and responsibility and payment of marital debts. While communicating with wife, husband reiterated his desire "to settle as efficiently as possible," that he was not "trying to make things any harder than they already are," and that he simply wanted to "release [them] both from bondage and debt and start over fresh and clean and as easily as possible." Moreover, husband

---

[2] Husband testified that he had told wife and their son that he was going to the store when he absconded to South Carolina.

[3] Wife offered to move to South Carolina, begin counseling, and to "get off the anxiety meds so that [she] can have [her] desire back."

noted they didn't "need the State of VA involved with [their] separation." On November 16, 2020, husband sent two emails to wife's attorney, Robert J. Breimann ("Mr. Breimann"), detailing his proposed property settlement terms including his desired personal property, the disposition of the marital home and associated obligations, and each party's responsibility for individual and marital debts.

Wife filed for divorce on November 18, 2020. On November 20, 2020, wife filed a notice for emergency hearing to take place on November 23, 2020. On November 22, 2020, wife informed husband that he needed to come back to Virginia to sign papers for the sale of his boat and to be served with papers. Wife did not inform husband of the nature of the service. When husband arrived at the marital residence on November 23, 2020, he was served, only an hour before the hearing, with all the court filings by a private process server.

Once at the courthouse, husband and wife continued negotiating the property settlement agreement ("PSA") before the hearing. Mr. Breimann was present during the initial negotiations, informed husband that he was representing wife, and discussed the agreement with husband and wife before leaving them to negotiate alone. Mr. Breimann also informed husband that if he did not sign the agreement, then husband would have to attend the emergency hearing that day. During negotiations, husband and wife made two alterations to the PSA: 1) that wife was to receive "100% of the John Hancock account with a present balance of approximately $24,000.00" rather than half; and 2) "wife agrees to use $12,000.00 from the John Hancock account to make mortgage payments. The Husbands [sic] obligation in this account will commence thereafter." Both alterations were initialed by both husband and wife. Both husband and wife signed the PSA.

Given that the PSA governed all issues in their divorce proceeding, the emergency hearing was never held on November 23, 2020. On January 29, 2021, Mr. Breimann filed a

motion to incorporate the PSA into the divorce decree, giving it the full effect of a court order. The hearing was scheduled for February 8, 2021. In response, husband retained Robert M. Galumbeck ("Mr. Galumbeck") and filed a motion requesting the court allow filing of late pleadings as well as grant a continuance for the hearing scheduled that day. The court granted the motion to file late pleadings and continued the hearing on the motion to incorporate to February 19, 2021. In an order dated March 31, 2021, the court granted the motion to incorporate the PSA pendente lite.

On April 14, 2021, the court held a hearing, concerning the validity of the PSA. The parties submitted memoranda and presented testimony. Following the hearing, in a letter opinion dated December 27, 2021, the court made the following pertinent findings:

> In this case, it is difficult to determine whether or not a gross disparity in the asset division exists. Jason did agree to assume the marital debt for his truck, the Lincoln driven by Kristi, the house, the boat, and Elijah's car. However, the parties sold the boat prior to executing the PSA and agreed to sell the house as soon as possible. Jason agreed to use his John Hancock retirement account to pay off Elijah's car and to make mortgage payments until the marital home was sold. All the evidence indicates that this provision was added to the PSA at the request of Jason. Kristi agreed to assume her student loan debt (approximately $2,000) and "the remaining balance on her loan from the wife's 401(K) account." See PSA ¶ 4. The amount of that debt was not provided.

> In ¶ 6 of the PSA the parties "agree to equally divide any and all assets contained in any pension accounts, retirement accounts, savings accounts, IRA accounts, 401(K) accounts, or any other account of any nature or description created during this marriage." Again, these amounts are not in evidence.

In an order dated March 1, 2022, the court incorporated its December 27, 2021 letter opinion holding the PSA valid. The court then issued a final divorce decree incorporating the PSA on May 2, 2022. On May 31, 2022, husband filed this appeal.

- 4 -

ANALYSIS

Husband argues that the circuit court erred when it incorporated the PSA into the final divorce decree because he claims that the agreement is unconscionable. Any court may incorporate by reference, in its decree of divorce, any valid agreement between the parties. Code § 20-109.1. "Any issue of unconscionability of a premarital agreement shall be decided by the court as a matter of law. Recitations in the agreement shall create a prima facie presumption that they are factually correct." Code § 20-151(B). *See* Code § 20-155 (providing that Code § 20-151 applies to marital agreements as well as premarital agreements).

> While the question of unconscionability is a matter of law, the underlying facts must be determined by the fact finder, and on appeal we determine whether there is sufficient evidence to support the factual findings. If there is credible evidence in the record supporting the factual findings made by the trier of fact, we are bound by those findings regardless of whether there is evidence that may support a contrary finding.

*Sims v. Sims*, 55 Va. App. 340, 348 (2009) (quoting *Galloway*, 47 Va. App. at 92). "[The party] contesting the [agreement] must prove the allegations by clear and convincing evidence." *Derby v. Derby*, 8 Va. App. 19, 26 (1989). "We review the evidence in the light most favorable to [wife], as the prevailing party." *Id.*

"To determine whether an agreement is unconscionable, a court must examine the 'adequacy of price' or 'quality of value.'" *Galloway*, 47 Va. App. at 92 (quoting *Drewry v. Drewry*, 8 Va. App. 460, 472 (1989)). "If a 'gross disparity in the value exchanged' exists then the court should consider 'whether oppressive influences affected the agreement to the extent that the process was unfair and the terms of the resulting agreement unconscionable.'" *Drewry*, 8 Va. App. at 472 (quoting *Derby*, 8 Va. App. at 28). Thus, "[a]ppellant must prove both 1) a gross disparity existed in the division of assets and 2) overreaching or oppressive influences." *Galloway*, 47 Va. App. at 92. *See Shenk v. Shenk*, 39 Va. App. 161, 179 n.13 (2002).

In the present case, it is entirely unclear whether a gross disparity exists between the parties' division of marital assets. The PSA contains only three provisions enumerating the value of any debts, payments, or assets: 1) the distribution of the entirety of husband's John Hancock account with a balance of $24,000 to wife; 2) spousal support in the amount of $750 per month to be paid by husband to wife after sale of the marital home; and 3) that $12,000 of the John Hancock account would be used by wife to pay the mortgage at which point husband will take over responsibility of mortgage payments until the home could be sold. The portions related to the John Hancock account were changes that husband insisted upon during negotiations in the courthouse before the November 23, 2020 emergency hearing.

Elsewhere, the PSA is devoid of any indication of the value of the marital assets and debts. Per the agreement, wife would be responsible for her student loans, a loan from her 401(k) account, and any debts created by her on or after October 25, 2020. Husband would be responsible for all other marital debts in addition to the remaining balance on their son's car. There is no indication as to the amounts of these debts or what other debts were created during the marriage. Aside from the John Hancock account, all other accounts would be split evenly between the parties. Attached to the PSA, labeled Exhibit A, was a list of personal property husband had requested in a series of emails sent to Mr. Breimann. The rest, husband indicated in his emails, could be disposed of at wife's discretion.

During the hearing held April 14, 2021, no testimony or evidence was presented concerning the value of the assets or debts retained by either party. In spite of this, husband claims on brief and in oral argument that 80% of the marital assets went to wife and that he had retained most of the marital debt. However, the written statement of facts approved by the trial court and filed in this Court does not support that claim. The filing states "Defendant believes that the agreement is unfair and gives well over 80 percent of the parties' assets and debts to the

Defendant." The filing states further that "[h]e testified that he gave up most assets and took on most debt and the PSA was skewed heavily to the wife." Such conclusory statements do not provide the evidence of value sufficient to evaluate the disparity. The circuit court, in its letter opinion, in fact, noted the difficulty of determining whether a gross disparity existed given the scant evidence before it.

Husband, as the challenger to the validity and incorporation of the PSA, bore the burden to prove by clear and convincing evidence that it was unconscionable. *See Derby*, 8 Va. App. at 26. Viewing the evidence in the light most favorable to wife, it is unclear from the record whether a gross disparity existed in the property division between the parties. *See id.* Given that husband had to prove a gross disparity existed before we analyze any "overreaching or oppressive influences," his failure to do so ends our inquiry into the unconscionability of the PSA. *See Galloway*, 47 Va. App. at 92; *see also Shenk*, 39 Va. App. at 179 n.13. As such, we hold that the PSA is a valid marital agreement and affirm the circuit court's incorporation of it into the parties' final divorce decree.

## CONCLUSION

Husband failed to meet his burden showing, with clear and convincing evidence, that the PSA was unconscionable. Specifically, he failed to introduce into the record evidence showing a gross disparity resulted from the division of the parties' marital assets and debt. Therefore, we affirm the circuit court's incorporation of the PSA into the final divorce decree as a valid marital agreement.

*Affirmed.*