COURT OF APPEALS OF VIRGINIA

Present: Judges Alston, O'Brien and AtLee
Argued at Fredericksburg, Virginia

RAJ MARNI

v.      Record No. 0103-18-4

KSENIJA MARNI

MEMORANDUM OPINION[*] BY
JUDGE ROSSIE D. ALSTON, JR.
NOVEMBER 13, 2018

FROM CIRCUIT COURT OF LOUDOUN COUNTY
Jeanette A. Irby, Judge

Samuel A. Leven (The Baldwin Law Firm, LLC, on briefs), for
appellant.

Ksenija Marni, *pro se*.

Raj Marni (appellant) appeals the trial court's decision to grant appellee's motion to strike. Appellant contends that (1) he established a *prima facie* case of unconscionability. Alternatively, he argues that the trial court erred when it sustained objections to his testimony regarding the following: (2) reconciliation; (3) appellee's income; and (4) the trial court's refusal to admit his post-trial proffer of that evidence, thus preventing appellant from sustaining his burden. We find that the trial court did not err in granting appellee's motion to strike, but even assuming *arguendo* that the trial court had erred in any of its evidentiary rulings, the error was harmless. Accordingly, we affirm the trial court.

---

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

UNPUBLISHED

I. BACKGROUND

Appellant and Ksenija Marni (appellee) were married in 1991 and had two children.[1] The parties entered into a separation agreement on January 11, 2016, and signed an amended version of that agreement on February 8, 2016. Appellee filed a bill of complaint for divorce on December 29, 2016 on the ground of living separate and apart for more than one year. At a hearing on June 2, 2017, appellant made an oral motion for leave to file a late responsive pleading, which the trial court granted, as well as an oral motion to set aside the agreement. In his responsive pleading, appellant alleged adultery as a ground for divorce and argued that the agreement was invalid, void, and unconscionable.[2]

The trial court bifurcated the divorce proceeding from agreement-related matters and awarded appellee a divorce based upon a one-year separation. The trial court entered the final divorce decree on June 19, 2017, and ultimately heard agreement-related matters on December 4, 2017. Those included whether the agreement was unconscionable and whether it should be incorporated into the final divorce decree.

At the December 4, 2017 hearing, appellant testified. Appellant maintained that during the parties' separation, appellee emailed appellant about her financial needs. Appellant, believing that "[appellee had] a change of heart," arranged for the parties to meet for dinner. Appellee brought a draft separation agreement to dinner, which appellant signed. As they continued to discuss financial matters and the agreement, appellee made notations on a napkin. A few days later, on January 11, 2016, appellee brought the revised agreement to appellant's house. Appellant had the agreement in his possession for an hour and a half, yet according to appellant, he reviewed it for just a couple of minutes prior to signing it. The agreement was

---

[1] Their daughter is an adult but is still dependent upon the parties. Their son is a minor.

[2] Only filings relevant to this appeal will be discussed.

- 2 -

notarized. Afterwards, the parties communicated over email. Appellee expressed that she was in financial need and sought to amend the agreement. Appellee emailed appellant the amended agreement, but appellant did not "recall all the email." The parties met near a bank on February 8, 2016. There, appellant "looked at [the agreement] briefly for a second," and then signed it. That agreement was also notarized. Shortly thereafter, appellant flew to the Ukraine. Upon his return several months later, appellee requested payments pursuant to the terms of the agreement. For the first time, appellant parsed the agreement "line-by-line" and "found out it [was] just impossible to meet."

Upon the parties' divorce, appellant testified he was to retain the following assets: his vehicle, books, clothing, and personal computer. Appellant then testified to his income. Upon appellant's release from federal prison due to a fraudulent transaction conviction, appellant earned ten dollars an hour in 2012. In 2013 and 2014, he earned between $30,000 and $40,000 annually. In 2015, appellant was employed by Apps Associates and earned a gross monthly income of $15,000, excluding his bonus. Appellee covered most of the household expenses between 2012 and 2015. During questioning about his income and expense statement, appellant testified to the following monthly expenditures: $368 for appellee's health insurance, $685 for their daughter's living expenses, $1,100 for their daughter's tuition, $100 for their son's lunch, $386 for their son's basketball fee, $380 for their daughter's miscellaneous spending, $160 for their son's miscellaneous spending, $140 for the children's school supplies, $190 for the children's clothing, $278 on the Prosper Loan, $745 on the Circle Bank loan, $1,147 on car payments for his vehicle, appellee's vehicle, and their daughter's vehicle, in addition to his own vehicle insurance. Appellant also agreed to cover their son's expenses during his collegiate studies. Appellant also assumed all tax liabilities. Appellant owed approximately $1,100,000 in restitution for his federal conviction to be paid at the rate of $150 per month.

Appellant alleged that if bound by the agreement's terms, his expenses would far exceed his income, resulting in a monthly deficit of over $3,000. Appellant stated that this figure did not include his $2,000 child support and $4,000 spousal support obligations, which would produce a $9,000 deficit.

Cross-examination revealed that appellant paid $3,500 in mortgage payments on a home purchased in February of 2016 and that he had $58,000 in liquid assets. Appellant admitted to traveling to Dubai with his son—roundtrip tickets cost over $2,000. Appellant conceded that he was also approved for a $1,000,000 loan, but he denied having a second home under contract. The approval letter reflected appellant's "exemplary" credit score and was contingent only upon an appraisal and sale of his current home. While refusing to comply with the agreement, appellant admitted that he offered to pay appellee $2,000 for rent, $1,000 for food, car payments, and her medical insurance as long as she requested specific sums from appellant each month. During this time, appellant also offered to fly appellee to her native country of Slovenia and deposited $20,000 into her bank account. Appellant maintained that this sum did not constitute spousal support, child support, or a gift. Appellant noted that their son lived with appellee and that appellant paid separate sums to him.

Appellee testified. According to appellee, appellant sent her a template agreement so that the parties could avoid the expense of having an attorney prepare it. She completed a draft agreement after the parties exchanged several communications. After being revised, the parties signed the agreement at appellant's home in January of 2016. After being amended, the parties signed the agreement at a bank in February of 2016 before appellant's trip to the Ukraine. Appellee testified that the purpose of that trip was for appellant to meet a thirty-year-old woman he connected with on a dating site.

Appellee also testified about her income. Appellee opened a real estate business, Lifestyle Associates, in either 2009 or 2010. From her business, she earned $40,000 in gross receivables in 2016—after deductions, her income was $15,000, and $50,000 in gross receivables in 2017. Appellee was also the sole owner of a company called M4 Technologies. Appellee testified that appellant directed her to establish M4 Technologies for his benefit as an entity through which he could be billed for his consulting work for Smartronix. Appellee further maintained that she does not have a background in the technological field whereas appellant "has [his] masters' degree in IT." As sole owner of M4 Technologies, she issued appellant 1099s in 2015 and 2016, but she could not remember the exact amounts. The parties filed a joint tax return, but she could not remember their combined income for 2015. While appellant was incarcerated, appellee covered expenses with her earnings, bank loans, and borrowed funds from relatives. Appellee noted she drew two loans in her name for appellant's benefit—a $10,000 loan with Prosper to cover appellant's taxes and a $29,000 loan from Circle Bank to cover appellant's expenses for his company, Samurai Technology Corporation.

Appellee also testified to appellant's income; she received an email from appellant indicating that his compensation package was valued at approximately $400,000.

Appellee was not cross-examined.

At this point in the proceeding, appellee made a motion to strike, arguing that appellant did not make a *prima facie* case of unconscionability, and requested that the agreement be incorporated. The trial court found that there was "absolutely no evidence of appellant being tricked into signing the agreement." In making its ruling, the trial court noted that appellant testified "at a minimum" that the parties had financial discussions, none of which included references to reconciliation. Appellant then testified that appellee brought the agreement to appellant's home on January 11, 2016, and that he had it in his possession for approximately an

hour and a half prior to signing it. The trial court also noted appellee's unrebutted testimony. Appellant "was the one who" sent her a template agreement. Perhaps motivated to finalize these matters prior to "leav[ing] the country," appellant signed the amended agreement several weeks later in February of 2016.

Regarding whether the agreement was "so one-sided," the trial court acknowledged that income and expense statements often reflect "a negative number" but continued that it did not "find [the agreement] so unconscionable, even on its face." The trial court mentioned that appellant qualified for a $1,000,000 loan and observed that appellant must either have "a lot of equity to offset that [sum] or no equity . . . [and a significant amount of] income." The trial court then granted appellee's motion to strike. Subsequent to its ruling, the trial court heard evidence regarding appellee's request to incorporate the agreement. Ultimately, the trial court incorporated the agreement and awarded appellee $2,000 in attorney's fees.

On January 5, 2018, the parties presented the trial court with a draft order. At that time, appellant's counsel requested that the trial court admit proffered testimony that was excluded at the December 4, 2017 hearing. Appellee's counsel objected, noting that the proffer was not contemporaneous with the hearing. The trial court refused to admit the proffer, stating it was no longer accepting evidence. The trial court then entered the final divorce decree.

As the deadline for the parties' presentation of the record for appeal approached, appellee, now proceeding *pro se*, requested an extension to file her brief. This Court granted appellee's request, extending the deadline to June 4, 2018. Subsequently, appellant objected to and made a motion to strike her brief, asserting several procedural violations. Appellee responded that she was compliant and attached a document clarifying her references to the record.

## II. ANALYSIS

### A. PROCEDURAL MATTERS

Before proceeding to the merits, we first consider appellant's allegations regarding appellee's brief. He contends that her brief ran afoul of Rules 5A:2(a)(1), 4(b), 19(f), 21(c) and (d), and 24(a). Consequently, he requests that we strike appellee's brief and bar her from oral argument. We consider each argument in turn.

Rule 5A:2(a)(1) requires that

> [a]ll motions shall contain a statement by the *movant* that the other parties to the appeal have been informed of the intended filing of the motion. For all motions in cases when all parties are represented by counsel[,] . . . the statement by the movant shall also indicate whether the other parties consent to the granting of the motion, or intend to file responses in opposition.

(Emphasis added).

This Rule pertains to motions made by the moving party, and therefore does not apply to appellee's brief, a pleading submitted by the non-moving party.

Rule 5A:4(b) requires that

> [a]ll briefs . . . be bound on the left margin in such a manner as to produce a flat, smooth binding. Spiral binding, acco fasteners, and the like are not acceptable. The style of the case (with the name of the appellant stated first) and the record number of the case and the name, Virginia State Bar number, mailing address, telephone number (including any applicable extension), facsimile number (if any), and email address of counsel submitting the document shall be placed on the front cover.

Other than appellant's bare assertion that appellee's brief was not properly bound, there is no evidence of noncompliance with the Rule. Accordingly, we find no basis for appellant's argument on the matter.

Rule 5A:19(f) provides that

> [a]n electronic version . . . must be filed with the clerk of this Court and served on opposing counsel at the time of filing the brief

with the Court . . . . For purposes of this Rule, service by email shall be governed by Rule 1:17, which allows electronic transmission without the need of consent by opposing counsel. The electronic version must be filed in the manner prescribed by the VACES Guidelines and User's Manual, using the Virginia Appellate Courts eBriefs System (VACES) . . . . In addition, 3 printed copies of each brief . . . shall be filed in the office of the clerk of this Court. All briefs shall contain a certificate evidencing the date and method of electronic transmission of the brief to opposing counsel.

We note that this Court granted appellee an extension to file her brief until June 4, 2018. The time stamp on appellee's brief clearly shows that it was electronically submitted "on 06-03-2018 22:50:33 EDT for filing on 06-04-2018" and it contains the required certification. Appellee mailed three paper copies to this Court and a copy to appellant's counsel by certified mail on June 4, 2018. Accordingly, appellee's brief was compliant.

Appellant argues that appellee's brief violated Rule 5A:21 generally because she inserted a subsection on her objections, a section not provided for by the Rule. The Rule indicates what appellee's brief should contain, but it does not prohibit additional sections from being included in the brief. Rule 5A:21.

Appellant next contends that appellee violated Rule 5A:21(c) because she included prejudicial and irrelevant facts and did not provide "appropriate references to the pages of the transcript, written statement, record or appendix." We presume that the trial court "disregard[ed] prejudicial or inadmissible evidence," Pierce v. Commonwealth, 50 Va. App. 609, 617, 652 S.E.2d 785, 789 (2007) (quoting Cole v. Commonwealth, 16 Va. App. 113, 116, 428 S.E.2d 303, 305 (1993)), and there was no indication to the contrary. With respect to appellant's second allegation, appellee's citations are to specific documents within the record, such as the trial transcript, as indicated by "TT," or to exhibits, indicated by "EXH." She notes the page number where the referenced information appears within these particular documents.

Appellant also cites violations of Rule 5A:21(d), stating that appellee did not properly set forth the standard of review and argument for appellant's assignments of error. "[S]tatements unsupported by argument, authority, or citations to the record do not merit appellate consideration." Mabe v. Wythe Cty. Dep't of Soc. Servs., 53 Va. App. 325, 332, 671 S.E.2d 425, 428 (2009) (quoting Epps v. Commonwealth, 47 Va. App. 687, 718, 626 S.E.2d 912, 926 (2006)). Appellee included case law and argument for assignment of error 1 but simply stated she agreed with the trial court and disagreed with appellant with respect to assignments of error 2-5. Thus, appellee's error was significant for assignments of error 2-5. Accordingly, she waived argument, on brief and orally, on those assignments of error. Id.

Finally, Rule 5A:24(a) requires that the cover of appellees' brief be blue. Appellee contends she filed her brief with the requisite blue cover. There is no evidence to the contrary.

The only procedural violations that were substantiated were violations of Rule 5A:21(d). Accordingly, our consideration of appellee's brief and oral argument is confined to assignment of error 1.

B. MERITS

i. UNCONSCIONABILITY

"When considering on appeal a trial court's decision to grant a motion to strike, 'it is [this Court's] duty to view the evidence and all reasonable inferences therefrom in the light most favorable to the [party] whose evidence was struck.'" Barnes v. Barnes, 64 Va. App. 22, 28-29, 763 S.E.2d 836, 839 (2014) (quoting Costner v. Lackey, 223 Va. 377, 381, 290 S.E.2d 818, 820 (1982)).

> Th[e] standard [that governs the trial court's review of the plaintiff's evidence] requires the trial court to accept as true all the evidence favorable to the plaintiff as well as any reasonable inference a jury might draw therefrom which would sustain the plaintiff's cause of action. The trial court is not to judge the weight and credibility of the evidence, and may not reject any

> inference from the evidence favorable to the plaintiff unless it would defy logic and common sense.

Chaplain v. Chaplain, 54 Va. App. 762, 772-73, 682 S.E.2d 108, 113 (2009) (quoting Austin v. Shoney's, Inc., 254 Va. 134, 138, 486 S.E.2d 285, 287 (1997)).

At issue is whether or not the agreement is unconscionable. "Marital property settlements entered into by competent parties upon valid consideration for lawful purposes are favored in the law and such will be enforced unless their illegality is clear and certain." Galloway v. Galloway, 47 Va. App. 83, 91, 622 S.E.2d 267, 271 (2005) (quoting Cooley v. Cooley, 220 Va. 749, 752, 263 S.E.2d 49, 52 (1980)). Thus, appellant bore the "burden at trial to prove by clear and convincing evidence the grounds alleged to void or rescind the agreement." Id. (quoting Drewry v. Drewry, 8 Va. App. 460, 463, 383 S.E.2d 12, 12 (1989)).

To demonstrate unconscionability,

> Appellant must prove both 1) a gross disparity existed in the division of assets and 2) overreaching or oppressive influences. Shenk v. Shenk, 39 Va. App. 161, 179 n.13, 571 S.E.2d 896, 905 n.13 (2002). Courts must view the apparent inequity in light of other attendant circumstances to determine whether the agreement is unconscionable and should be declared invalid.

Id. at 92, 622 S.E.2d at 271 (citing Derby v. Derby, 8 Va. App. 19, 29, 378 S.E.2d 74, 79 (1989)).

"If inadequacy of price or inequality in value are the only indicia of unconscionability, the case must be extreme to justify equitable relief." Derby, 8 Va. App. at 29, 378 S.E.2d at 79. "[G]ross disparity in the value exchanged is a significant factor in determining whether oppressive influences affected the agreement to the extent that the process was unfair and the terms of the resultant agreement unconscionable." Id. at 28, 378 S.E.2d at 79. Overreaching or oppressive influences may be demonstrated in two ways:

> [w]hen the accompanying incidents are inequitable and show [(a)] bad faith, such as concealments, misrepresentations, undue

- 10 -

> advantage, [or] oppression on the part of the one who obtains the benefit, or [(b)] ignorance, weakness of mind, sickness, old age, incapacity, pecuniary necessities, and the like, on the part of the other.

Id. at 28-29, 378 S.E.2d at 79.

On appeal, appellant argues that he established that the agreement was unconscionable in two ways: (1) there was a gross disparity in the division of the assets and appellee exerted oppressive influences and (2) compliance with the agreement would result in pecuniary necessity. Appellant also contends that the trial court improperly judged the weight and credibility of the evidence.

We proceed to the first prong of the unconscionability analysis, whether there was a gross disparity in the division of the assets. After viewing the evidence in appellant's favor, we find that appellant failed to sustain his burden. Even if we found that there was a gross disparity in the distribution of the assets, the disparity was not so extreme as to "justify equitable relief" standing alone. Id. at 28, 378 S.E.2d at 79. We cannot calculate appellant's financial state if bound by the agreement's terms because the record does not contain a full disclosure of the parties' assets. However, according to its terms, the parties "made [a] complete, fair and accurate disclosure to each other on all financial matters reflected in this [a]greement." "Recitations in the agreement shall create a *prima facie* presumption that they are factually correct." Galloway, 47 Va. App. at 91-92, 622 S.E.2d at 271 (quoting Code § 20-151(B)).

Appellant's share of the assets included his books, clothing, personal computer, and the 2012 Acura TL. Appellee's share of the assets included the 2007 Mercedes Benz (appellant was to assume associated costs but appellee was to pay car insurance), the 2009 Toyota Camry Hybrid, furniture, paintings, rugs, electronics, television, stereo equipment, computers, printers, her clothing, books and jewelry, as well as $18,975 in receivables from M4 Technologies. Appellant agreed to distribute 15% of his shares in Samurai Technology Corporation, a company

that he solely owned, to appellee and their two children in equal parts. In addition, appellant was to reimburse appellee $3,214.92 for a bill paid on his behalf as well as $7,947 to settle the IRS Offer-In-Compromise in addition to the amount she negotiates with the Commonwealth to settle all past taxes she owes. Appellant consented to assisting appellee in the purchase of a new home and providing a 5% down payment. Appellant agreed to timely pay the parties' federal and state income taxes for 2015. The parties waived their interests in each other's estates and retirement and released claims "to any assets in the possession of the other." Appellee also relinquished her interest in any of appellant's intellectual property rights.

Further, the parties were to "evenly divide any increase in the equity . . . from the date of purchase to the date of the . . . appraisal" of a property in Herndon, Virginia. Appellee agreed to purchase appellant's interest in this property "by paying him ½ of the increase in the equity in the property" in exchange for appellant's waiver of interest in the property.

Regarding income, appellant testified that upon his release from federal prison, he earned $10 per hour in 2012, between $30,000 and $40,000 per year in 2013 and 2014, and $15,000 per month—excluding his bonus—as an employee of Apps Associates in 2015. Appellee's unrebutted testimony conflicted with appellant's—she testified that the value of appellant's compensation package was $400,000. She also noted that appellant had an additional source of income; as sole owner of M4 Technologies, appellee issued appellant 1099s for his consulting work for Smartronix. Appellee derived her income from her own business, Lifestyle Associates. She earned $40,000 in gross receivables in 2016—her income, including deductions, was $15,000—and $50,000 in gross receivables in 2017.

Regarding expenses, appellee supported the family during appellant's incarceration and afterwards. Pursuant to the agreement, appellant was to assume expenses relating to the children's health care, education, and upkeep. Appellant promised to support the parties'

daughter during her collegiate studies and promised to do the same for the parties' son. He would also pay car payments and taxes. Appellant agreed to provide health care for appellee and maintain a life insurance policy naming her as the beneficiary. Appellant agreed to pay $2,000 in child support and $4,000 in spousal support per month. The support obligations increased 5% annually, and his child support obligation terminated on "September 31, 2020," whereas his spousal support obligation terminated upon the death of either party.

Although appellant has significant monthly expenses, he also has multiple sources of income, including that he qualified for a $1,000,000 loan, which signified that he was either sustained in equity or in income. He also had $58,000 in liquid assets and enough disposable income to arrange a trip to Dubai with his son.

We now turn to the second prong of the unconscionability test, whether or not overreaching or oppressive influences were exerted. We find that appellant failed to sustain his burden. Appellant primarily alleges that appellee induced him to sign the agreement by exerting oppressive influences. In both iterations of the agreement, the parties professed that they "voluntarily entered into this [a]greement and have not been forced to sign this [a]greement, and both the [p]arties confirm that they are in sound mental health." See Galloway, 47 Va. App. at 91-92, 622 S.E.2d at 271 (noting the presumption regarding recitations in agreements). The parties initialed the bottom of each page, and both agreements were notarized.

The parties' trial testimony is significant. Both testified that they discussed the terms of the agreements in-person and over email. Appellee testified unrebutted that appellant sent her a template agreement to avoid incurring attorneys' fees. She drafted the agreement after several conversations with appellant. Appellant then testified in a more detailed fashion to the circumstances surrounding signing the agreement. His more specific testimony coheres with appellee's more general testimony. After separating, appellant admitted that the parties had

- 13 -

conversations about finances.  At a subsequent dinner, those topics were discussed and a draft agreement was signed.  Based on dinner discussions, appellee revised the agreement and brought it to appellant's home on January 11, 2016.  Appellant had the revised agreement in his possession for an hour and a half, yet he only reviewed it for a couple of minutes before signing it.  Appellant also acknowledged that subsequently, the parties communicated about finances and appellee notified him that she sought to amend the agreement.  Appellant recalled receiving the amended agreement via email.  Appellant had the amended agreement in his possession and again chose not to review it.  Weeks later, before appellant left for the Ukraine, appellant "briefly" reviewed the agreement before signing it on February 8, 2016.  Only upon his return, after months had passed, did appellant, by his own admission, read the agreement in its entirety.

There is ample evidence of negotiation.  In addition to the circumstances outlined above, we acknowledge that one amendment to the agreement was in appellant's favor.[3]  Regarding appellant's argument, we note that the only reference to reconciliation on the record is prior to arranging for the parties to have dinner in January of 2016, appellant believed that "[appellee] had a change of heart."  His supposed belief is contradicted by appellee's unchallenged

---

[3] The February agreement contained the following changes:

1)  The following provision was deleted:  "The [p]arties have each consulted an attorney with regards to his or her legal rights arising out of the marital relationship and the terms of this Agreement."
2)  The spousal support provision "shall be fixed and non-modifiable" and only terminates upon the "death of [h]usband or [w]ife."
3)  Appellee retained only $18,975 in receivables from M4 Technologies instead of over $28,850.
4)  The provision regarding the purchase of a property in Herndon, Virginia was added.
5)  Appellant is now solely responsible for repaying the two loans.
6)  The following provision was deleted:  "The [p]arties may only amend this [a]greement in writing after both [p]arties have obtained legal advice on the changes."

testimony. She stated that shortly after signing the agreement in February of 2016, appellant went to the Ukraine to meet a woman he met on a dating site.

Appellant also contends that compliance with the agreement would result in pecuniary necessity. He relies on our holdings in Sims v. Sims, 55 Va. App. 340, 685 S.E.2d 869 (2009), and Plogger v. Plogger, No. 1032-96-3, 1997 Va. App. LEXIS 249 (Va. Ct. App. Apr. 22, 1997).[4] In Sims, husband entered into an agreement with wife "in which she waived spousal support and relinquished to him almost 100% of the marital estate—including the marital residence, all retirement benefits and deferred compensation—literally [leaving] her penniless with no practical means for supporting herself." Sims, 55 Va. App. at 353, 685 S.E.2d at 875. Significantly, wife only had a third-grade level of education and had numerous health problems. The trial court found that "this is about as grossly disparate a deal as probably anybody has ever seen." Id. This Court wrote that "under the facts of [that] case that gross disparity in conjunction with pecuniary necessity [coupled with a degree of infirmity] on the part of the disadvantaged spouse establishe[d] unconscionability." Id. at 350, 685 S.E.2d at 874-75. In Plogger, the agreement imposed "a shocking monthly support obligation upon husband[, $1,200 of husband's $1,386 monthly salary for two years,] that was not discussed by the parties." 1997 Va. App. LEXIS 249, at *5. Wife knew the obligation "was essentially impossible for [husband] to perform . . . [and] would leave him virtually penniless." Id. at *6. In addition, the "agreement provide[d] for a gross disparity in value exchanged." Id. at *5. Appellant's case is not analogous to these cases as appellant would like us to believe.

If bound by the agreement, appellant would not be left penniless. Further, his support obligations were not "shocking," nor do they amount to a majority of his monthly income. In

---

[4] "Although not binding precedent, unpublished opinions can be cited and considered for their persuasive value." Otey v. Commonwealth, 61 Va. App. 346, 350 n.3, 735 S.E.2d 255, 257 n.3 (2012) (citing Rule 5A:1(f)).

addition, at no point did appellant state that these obligations had not been discussed. Appellant has a lucrative career, an ability to continue working, and multiple sources of income.

We "cannot relieve one of the consequences of a contract merely because it was unwise." Owens v. Owens, 196 Va. 966, 974, 86 S.E.2d 181, 186 (1955). Considering the evidence in the light most favorable to appellant, we find that he failed to sustain his burden of proof.

Appellant also argues that the trial court erred when it granted appellee's motion to strike because the trial court improperly made "determinations of [appellant's] credibility, the credibility of his evidence, and the weight of the evidence."

We first acknowledge the presumption that the "trial [court] properly based [its] decision on the evidence presented . . . and properly applied the law." Brown v. Commonwealth, 8 Va. App. 126, 133, 380 S.E.2d 8, 12 (1989) (citations omitted). In our review of the record, while the trial court noted generally that income and expense statements resulted in negative figures and that appellant was approved for a $1,000,000 loan, the trial court did not make any credibility determinations or weigh that evidence. The trial court made its rulings and explained them with reference to appellant's testimony, appellee's unchallenged testimony, and introduced evidence. Ultimately, the trial court made rulings adverse to appellant's interests, but there is no evidence that the trial court acted improperly.

ii. EVIDENTIARY RULINGS

Appellant next argues that the trial court erred when it sustained objections to appellant's testimony regarding reconciliation and appellee's income as well as when it refused to consider appellant's post-trial proffer of that excluded testimony. Appellant contends that those errors prevented him from establishing a *prima facie* case of unconscionability.

"Appellate courts review evidentiary rulings under an abuse of discretion standard." Boone v. Commonwealth, 63 Va. App. 383, 388, 758 S.E.2d 72, 75 (2014) (citing Boyce v.

Commonwealth, 279 Va. 644, 649, 691 S.E.2d 782, 784 (2010)). "Only when reasonable jurists could not differ can we say an abuse of discretion has occurred." Landeck v. Commonwealth, 59 Va. App. 744, 751, 722 S.E.2d 643, 647 (2012) (quoting Grattan v. Commonwealth, 278 Va. 602, 620, 685 S.E.2d 634, 644 (2009)).

Appellant attempted to testify about reconciliation during his direct examination. The following occurred:

> [APPELLANT'S COUNSEL]: And so during . . . any of these conversations with [appellee,] did you believe that the two of you were going to reconcile?
> [APPELLANT]: Yes.
> [APPELLANT'S COUNSEL]: And what did she say that . . .
> [APPELLEE'S COUNSEL]: Objection to relevance, Judge.
> [TRIAL COURT]: Well, it's not relevant and it was leading, so I'm going to sustain the objection.
> [APPELLANT'S COUNSEL]: Okay. What did you believe the purpose of these meetings was with [appellee]?
> [APPELLANT]: My, in my mind . . . .
> [APPELLEE'S COUNSEL]: Objection to relevance, Your Honor.
> [TRIAL COURT]: Again, it doesn't matter what, okay. Sustained in the way the question was formed.

"If any one of these grounds supported the exclusion, the trial court did not abuse its discretion." Creamer v. Commonwealth, 64 Va. App. 185, 194, 767 S.E.2d 226, 230 (2015). Appellant argued on brief that the testimony was relevant. "Evidence is admissible if it is relevant to an issue in the case and is not precluded by a specific rule." McCarter v. Commonwealth, 38 Va. App. 502, 506, 566 S.E.2d 868, 869 (2002) (citing Peacock Buick v. Durkin, 221 Va. 1133, 1136, 277 S.E.2d 225, 227 (1981)). "Evidence is relevant if it has any logical tendency to prove an issue in a case." John Crane, Inc. v. Jones, 274 Va. 581, 590, 650 S.E.2d 851, 855 (2007) (quoting Goins v. Commonwealth, 251 Va. 442, 461, 470 S.E.2d 114, 127 (1996)). "[R]elevant evidence may be excluded only if the prejudicial effect of the evidence outweighs its probative value." Id. The purpose of the December 4, 2017 hearing was whether

the agreement was unconscionable and whether it should be incorporated. Reconciliation has been considered in such an inquiry. See, e.g., Derby, 8 Va. App. 19, 378 S.E.2d 74.

Appellant also attempted to testify to appellee's income. He began "[w]ell, in 2015 she had the company, M4 Techonologies. [Appellant] provided the consulting services. Her company was making close to . . . $160,000 or $170,000." Appellee's counsel objected on the basis of hearsay, which the trial court sustained. Appellant's counsel proceeded with this line of questioning, inquiring whether the parties filed a joint tax return. Appellant replied that they did and attempted to testify as he had above. Appellee's counsel objected again on the ground of hearsay. Appellant's counsel responded that these were also appellant's tax returns; thus, appellant had personal knowledge of its contents. Nevertheless, the trial court sustained the objection, noting "[t]ax returns are still hearsay."

"Hearsay evidence is 'testimony in court . . . of a statement made out of court, the statement being offered as an assertion to show the truth of matters asserted therein, and thus resting for its value upon the credibility of the out-of-court asserter.'" Campos v. Commonwealth, 67 Va. App. 690, 704, 800 S.E.2d 174, 181 (2017) (quoting Commonwealth v. Swann, 290 Va. 194, 197, 776 S.E.2d 265, 268 (2015)). "[H]earsay evidence is inadmissible unless it falls within one of the recognized exceptions to the hearsay rule, and . . . the party attempting to introduce a hearsay statement has the burden of showing the statement falls within one of the exceptions." Id. (quoting Godoy v. Commonwealth, 62 Va. App. 113, 119, 742 S.E.2d 407, 410-11 (2013)). Appellant argues other bases of admissibility on brief; the parties' joint tax return contained statements made by the opposing party and adoptive admissions. These arguments were not presented to the trial court; therefore, we will not consider them. See Ohree v. Commonwealth, 26 Va. App. 299, 308, 494 S.E.2d 484, 488 (1998) (citing Rule

5A:18). Thus, we are left to consider whether the evidence was properly excluded on the basis of hearsay.

After the December 4, 2017 hearing, the parties presented the trial court a draft order. At that time, appellant's counsel, as the proponent of the evidence, presented appellant's proffer, stating that it contained "what some of [appellant's] testimony would have been, had it not been excluded." Appellant's counsel then requested that the proffer be admitted into evidence. Appellee objected because the proffer was not contemporaneous with the December 4, 2017 hearing. The trial court rejected the proffer stating "Yes. Evidence has been closed. You can file a motion to reconsider, . . . [b]ut as far as taking any evidence at this point, . . . I'm not going to accept any further proffers."

Under clearly established principles of law, it is required that

> the proponent "ma[k]e known" "the substance of the evidence . . .
> to the court by proffer." Rule 2:103(a)(2); see Ray v.
> Commonwealth, 55 Va. App. 647, 650 n.1, 688 S.E.2d 879, 881
> n.1 (2010). "[M]any trial issues are resolved with proffered
> evidence, . . . [and] counsel and the trial court must ensure [that
> such] proffers contain all of the information necessary" to achieve
> two purposes: to allow the trial court a fair opportunity "to resolve
> the issue at trial" and "to provide a sufficient record for . . .
> review." Albert v. Albert, 38 Va. App. 284, 290 n.1, 563 S.E.2d
> 389, 392 n.1 (2002). On appeal, the purpose may also be dual: to
> allow the appellate court to determine whether the trial court erred
> in excluding the evidence and, if so, whether that error was
> harmless. See Montgomery v. Commonwealth, 56 Va. App. 695,
> 706, 696 S.E.2d 261, 266 (2010) . . . . The appropriate time for
> making the proffer and the range of content required depend, in
> part, on the proffer's purpose.

Creamer, 64 Va. App. at 195, 767 S.E.2d at 230.

"[A] litigant who offers certain evidence has a . . . duty to make clear, in the same contemporaneous fashion, the bases upon which he contends the offered evidence should be admitted." Id. at 196, 767 S.E.2d at 231 (citing Jones v. Commonwealth, 50 Va. App. 437, 445, 650 S.E.2d 859, 863 (2007)). A "proffer may be made 'either during trial or after the verdict'

- 19 -

when its only purpose is 'to provide a complete record for appeal[] and not to assist the trial judge in ruling on the admissibility of evidence.'" Id. at 203, 767 S.E.2d at 235 (quoting Lowery v. Commonwealth, 9 Va. App. 304, 308, 387 S.E.2d 508, 510 (1990)). Yet,

> where a defendant, post-trial, proffers a different, more detailed or additional basis for concluding that evidence offered during trial was relevant and should have been admitted and the trial court rejects that proffer, the appellate court may not consider the contents of the untimely proffer in reviewing the correctness of the trial court's ruling excluding the evidence. Instead, the appellate court may consider only the representations regarding the evidence that the trial court considered.

Id. at 198, 767 S.E.2d at 232.

When presenting the proffer, appellant's counsel did not state the purpose for the proffer's admission. While the written proffer is not contained in the record, references to the proffer's contents appear in a pleading entitled "Ex-Husband's Exceptions to Order Incorporating [the agreement.]" There, appellant summarized that his proffered testimony would include that "[appellee] induced him to sign the property settlement agreement largely by implying to him that it would help lead to a reconciliation" as well as his testimony that appellee earned $160,000 in 2015. Appellant also attached the proffer as an addendum to his brief.

Moreover, assuming without deciding that the trial court erred in these rulings, any error was harmless. Accordingly, we need not rule whether the trial court abused its discretion in sustaining the objections nor whether the trial court erred in refusing to accept appellant's post-trial proffer.

"In Virginia, non-constitutional error is harmless '[w]hen it plainly appears from the record and the evidence given at the trial that the parties have had a fair trial on the merits and substantial justice has been reached.'" Andrews v. Creacey, 56 Va. App. 606, 625, 696 S.E.2d 218, 227 (2010) (alteration in original) (quoting Code § 8.01-678). "If, when all is said and done, [it is clear] that the error did not influence the [fact finder], or had but slight effect, [then]

. . . the judgment should stand." Id. (first and second alterations in original) (quoting Clay v. Commonwealth, 262 Va. 253, 260, 546 S.E.2d 728, 731-32 (2001)).

The only evidence of reconciliation on the record is appellant's unsupported statement that he believed that appellee had "a change of heart" after she emailed him about her financial needs. Any additional evidence of reconciliation stands in stark contrast to appellee's unchallenged testimony that shortly after signing the February agreement, appellant flew to the Ukraine to meet a woman he connected with on a dating site. The effect of possible reconciliation is also significant. According to the agreement, "[i]f the [p]arties reconcile, the terms of this [a]greement will remain in effect unless the [p]arties revoke it in writing." There was no such written revocation.

With regard to appellee's 2015 income, she clearly explained that *appellant* derived income from M4 Technologies, not herself. She testified unrebutted that she established M4 Technologies on appellant's behalf so he could be billed for his consulting work for Smartronix. Appellee stated she earned income through her company, Lifestyle Associates.

### III. CONCLUSION

The trial court did not err in granting appellee's motion to strike; appellant failed to establish that the agreement was unconscionable. If the trial court erred in any of its evidentiary rulings, that error was harmless. Thus, we affirm the trial court.

Affirmed.